1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ANGELA MARIE THOMPSON,

11              Petitioner,                No. 1:05-cv-00141 ALA HC

12        vs.

13   GLORIA HENRY, Warden,              _____ORDER

14              Respondent.

15   _____/

16        Petitioner is proceeding *pro se* with an application for writ of habeas corpus under 28

17   U.S.C. § 2254(a).  Petitioner challenges a conviction entered in the Tulare County Superior

18   Court on December 10, 2001 for second degree murder, assault, and felony child abuse.

19   Additionally, Petitioner was convicted of two misdemeanor counts of child abuse.  She is

20   serving a sentence of twenty-five years to life imprisonment.  Petitioner asserts that her federal

21   constitutional rights were violated at her trial.

22                                    **I**

23        On November 21, 2003, the California Court of Appeal summarized the facts underlying

24   the petitioner's conviction and sentence as follows:

25                     Over the course of several years defendant and her
26                husband, Gerald, adopted 12 children. The oldest child was a

1

daughter, A., born in 1983. Joshua, J., Matthew, Paul, and Micah were the oldest boys, with birthdates from late 1984 until 1986. E., a son and the victim in count 4, was born in 1991. M., a daughter and the victim in count 5, was born in 1992. Mark was born in 1993. The deceased child, Rachel, was born in 1995 and had a twin sister, Rebecca. The youngest child was Benjamin, born in 1995.

On September 7, 2000, defendant drove all 12 children in the family van from Travis Air Force Base to Porterville, approximately a five-hour drive. Rachel did not finish her food fast enough when they were at Travis Air Force Base. This angered defendant, and she instructed A. to sit on Rachel. To do this, Rachel had to bend over at the waist, A. sat on top of her with her legs spread so that Rachel's head was between A.'s legs. A. and Rachel were sitting in the back seat of the van. Rachel was crying. Defendant told Rachel to shut up or she would sit on her. A. tried to shift her weight so she would relieve the pressure on Rachel and allowed Rachel to get up once so she could attempt to urinate in the container kept in the van for that purpose. Defendant had A. put a towel over Rachel's head so she would not garner any sympathy from the other children.

When the van arrived in Porterville, defendant took some of the children inside to see a doctor. J., Joshua, Rachel, M., E., and A. remained in the van. After the others had gone inside, A. got off of Rachel. A. noticed that Rachel was not moving. J. and Joshua moved Rachel to the front of the van and tried to get her to drink something. Joshua ran inside and got defendant.

Defendant ran out and began giving CPR to Rachel. A family nurse practitioner ran out and saw defendant giving CPR to Rachel. Defendant was frantic and asked him to do something. He began CPR. A doctor came out of the office and said the child needed to get to the hospital. Because the hospital was nearby, the nurse practitioner ran with Rachel to the emergency room.

Rachel arrived in the emergency room at approximately 5:50 p.m. Lisa Fitchpatrick, a licensed vocation nurse, took Rachel, started CPR, and ran with her to the trauma room. Rachel was not breathing and had no pulse. At the direction of the emergency room doctor, Fitchpatrick talked to defendant to find out how long Rachel had been without oxygen. Defendant told Fitchpatrick that she was inside the doctor's office when this happened. Her son ran in and said something was wrong with Rachel. He said to defendant that he had pulled a bag off of Rachel. After reporting this conversation, the doctor directed Fitchpatrick to ask defendant if Rachel had  been sick or had had any seizures recently. Defendant said that Rachel had not had any seizures. Others in the family had been sick, but Rachel had not.

Doctors attempted to revive Rachel. At 6:22 p.m. Rachel's temperature was 103.4 degrees, at 6:33 p.m. her temperature was 105.6. She was pronounced dead at 6:33 p.m. On September 7, 2000, the outside temperature was 82.8 at noon, 89.1 at 5 p.m. and 87.7 at 6 p.m. While medical staff attended to Rachel at the hospital, the 11 other children went to the home of Andrea

Ruckman, arriving at approximately 6 p.m. The children had attended the church where Andrea's husband was a youth pastor. Defendant called three times and spoke with J. and then A. Defendant also called Andrea and asked her to call Maureen Harold to come and pick up the children. Harold came by and picked up the children.

Detective John Hall contacted defendant and Gerald at the hospital. He asked where the children were; they refused to give any information about the children's location. The police eventually located the children and brought them to the police station after 2 a.m. One of the older boys said they could not talk until they had spoken to their mother. Defendant was brought into the room and she told the children they could speak to the officer. The children reported that Rachel had choked on a plastic bag in the van and denied that any abuse occurred in their home.

The emergency room doctor noted that Rachel had multiple scars and abrasions. While choking on a bag could account for cardiopulmonary arrest, such a scenario would also result in other findings that were not present. If Rachel could not breathe properly, because she was being sat upon, this could have resulted in a high temperature. This is because breathing is part of the regulatory mechanism for temperature. The doctor also noted that Rachel's vaginal opening was large and her hymen was notched. This is not normal for a five-year-old child. The emergency room doctor had worked on Rachel in November of 1999 when she was brought to the emergency room in an altered mental state. She had a subdural hematoma and was transferred to Valley Children's Hospital.

X-rays of Rachel's body were taken after her death. Dr. Frederick Young reviewed the X-rays. Rachel had a skull fracture. She had a broken left arm; the break was relatively fresh, having occurred within the previous two weeks. The fracture pattern of the arm was not typically associated with a fall, but was more consistent with a bending movement. Rachel had fractures at the base of the fingers on her right hand. These fractures were at least four to six weeks old. She had old fractures of her left hand fingers. She also had a fracture of the left fibula. An isolated fracture of the left fibula is not common and could have been caused from a hit or a kick. Dr. Young concluded that the combination of fractures were unexplained nonaccidental trauma.

Dr. Leonard Miller performed the autopsy on Rachel's body. Rachel weighed 38 pounds and was 41 inches tall. She had burn scars on the top of her left foot. She had scarring from a healed surgery on her head. She had multiple small red-tan dots on the soles of her feet. Samples from Rachel's feet were analyzed. It was Dr. Miller's opinion that Rachel had puncture wounds on the bottom of her feet. Dr. Miller concluded that Rachel died from positional asphyxia. Her body had been compressed, leading to hypoxia and cardiac irregularity and death. She would have been struggling to breathe and that would have generated heat in her body. There was also an element of dehydration. There were

3

changes to Rachel's eyes that could have resulted from having her head downward and straining and struggling.

Dr. David Chadwick concluded that Rachel's death was not accidental and she was a victim of battered child syndrome. It was his opinion that the fracture to Rache's arm occurred within a week of her death when a blunt object struck her forearm. The fracture to her left fibula occurred as a result of a blow to the leg. It was two to six months old. The fractures of the fingers were all less than six months old and occurred by direct blows or bending of the fingers. Rachel had swelling of the left leg that occurred within two days of her death. Her prior head injury in November of 1999 was a result of shaken infant syndrome. The head injury occurred within 24 hours of when she was taken to the hospital. Rachel had burn scars on her chest, leg and feet. The burns on the right side of her chest were not consistent with a child pulling water off of a stove and onto herself. Rachel had ligature marks around her ankles that indicated she had been tied up. She had puncture wounds to the soles of her feet. Rachel had 22 distinct injuries, and it was Dr. Chadwick's opinion that there is no possibility these injuries could all be accidental.

Dr. Ronald Gabriel, a specialist in pediatric neurology and neuroimaging, testified that the November 1999 hemorrhage on Rachel's brain was massive. Because there was no scalp or bone injury there must have been an additional component of vigorous shaking to cause the injuries. If Rachel had fallen, she would have had a swelling of the skin on her head and almost certainly a fracture. The bleeding from her head injury would be accelerated if she performed jumping jacks after receiving the injury. Her head injury was not accidental.

In addition to testifying regarding Rachel's prior head injury, Dr. Gabriel stated that the prior head injury would not have affected Rachel's ability to regulate her temperature preceding her death. It was Dr. Gabriel's opinion that if someone cannot breathe properly, his or her body will become hotter. Being sat upon could reduce the ability to circulate blood to ventilate the lungs. It was very unlikely that a five-year-old would choke on a bag because a five-year-old is intelligent enough to pull the bag out. In addition, the bag-choking scenario does not explain Rachel's high temperature. If Rachel had suffocated she would have had a low body temperature, but with her ventilation and circulation compromised, she could develop a high temperature.

Deputy Sheriff Brian Clower investigated the head injury and burn on Rachel's hand in November of 1999. In addition to her massive head injury, Rachel had a burn on her right palm, one tooth was broken, her mouth had been bleeding, her left hand was discolored and she had a small cut on her right leg. Defendant explained that the burn happened when Rachel grabbed a food sample at Costco. The cut occurred when Rachel fell out of a wagon. Defendant said that the family, except Rachel who was in bed, was worshipping in the living room when she heard Rachel scream. When defendant arrived in the bedroom, Rachel was on

4

the floor. Deputy Clower tried to interview the children but they were unavailable.

Defendant was interviewed on September 8, 2000, after Rachel's death and was asked about the prior injuries to Rachel. She stated that Rachel was burned when she pulled a pot of hot water off of the stove. Defendant said that Rache''s head injury was accidental. The marks around Rachel's ankles were explained as resulting from Rachel's socks being too tight. In addition, defendant stated that Rachel was accident prone.

Following the death of Rachel, all of the children were removed from the care of defendant and Gerald and placed in foster homes. The older boys (Joshua, J., Matthew, Paul and Micah) were returned to live with defendant and Gerald in October and remained in the home until February 20, 2001.

In late November of 2000, M. began reporting instances of abuse in the home. E. and M. were interviewed in December of 2000. The officer who interviewed M. looked for injuries to her. M. had crooked fingers on both hands and 12 little pinpoint holes on the bottom of her feet. In addition, she had a scar on her back of two parallel lines. About the same time, A. revealed to her lawyer, child protective service worker, and psychologist her involvement in Rachel's death, as well as other instances of abuse in the home. A. was charged with murder and pleaded to involuntary manslaughter in the juvenile court.

A doctor examined M., E. and A. There were scars on the hands of M. and E.M. said the marks on her fingers and hands were from being struck with a spoon. It was the doctor's opinion that the marks were consistent with M.'s explanation. The scars on A.'s wrist were consistent with being cut with a knife. A. had 22 scars on her leg. The scars were consistent with A.'s revelation that she had been hit with a spatula. An attorney representing the children looked at M.'s feet and E.'s feet after the children came forward with their revelations regarding abuse. M. and E. each had marks on their feet consistent with the marks on Rachel's feet at the time of the autopsy. In addition M. had marks on her hands.

A. testified as a prosecution witness. Defendant and Gerald adopted her when she was approximately seven and a half years old. Defendant adopted her natural brother, Joshua, at the same time. There was no physical punishment in the house until A. was approximately 12 years old. Then she was spanked on the hands. She was not allowed to cry during the punishment or defendant would keep punishing her. When the family moved to Porterville the spankings expanded to the feet, knees, thighs, arms, shoulders, toes and stomach. Defendant would hit A. and the others with a "rod." A rod was a spoon. A. was home schooled and was required to do the bulk of the cleaning and chores around the house.

Another method of punishment defendant used on A. and the other children was "poking." Defendant would pour alcohol on the bottom of the child's feet. She would then poke a safety pin or other sharp object into the bottom of the foot. Sometimes she would wiggle the pin around. A. would sometimes have to hold the

other children down while defendant poked them. Rachel was poked the most frequently because she did not eat her food. Sometimes defendant would poke the children in the mouth. A. held Rachel down when defendant poked her in the mouth. A. testified that Rachel was burned two separate times. Defendant told A. to boil water and bring it to her. A. did so. Rachel was on the bed, A. left. Rachel was burned on the stomach, thighs, hands, and feet. Defendant told A. that she put the hot water on Rachel.

A. recounted the night in 1999 when Rachel was taken to the hospital with a head injury. Rachel had been sent to her room and instructed to do jumping jacks because she did not finish her food. (A. testified that they were made to do jumping jacks as punishment, sometimes they were required to continue the jumping jacks for two hours at a time.) The remainder of the family was in the living room. Defendant sent A. to check on Rachel. Rachel was on the floor in the closet. A. swatted her and told her to continue her jumping jacks. A. returned to the living room. One to two minutes later Rachel screamed. They all ran in the room and found Rachel on the floor.

Another method of punishment used in the household was "plunging." A. testified that the bathtub would be filled up and defendant would force the children's heads down into the water. One time A. refused to be plunged. A. grabbed a pipe in the bathroom and held on. Defendant told J. to get a knife. He did and defendant cut A's arm to get her to let go of the pipe. A. bled a lot. A. showed the jury her scar from the knife incident.

Other forms of punishment included defendant's force-feeding the children when they did not finish their food or eat it fast enough. The children would be given time outs; the time-out position involved bending over from the waist and holding one's arms up behind one's back with their hands clenched together. They would have to do this for long periods of time. Defendant would also bend their fingers back. In addition, defendant would require one child to sit on another child as punishment. A. would help defendant administer punishments by holding the other children down when they were being punished. There was a rule in the house that A. could not be alone with other children because she was mean. This was known as the "[A.] rule."

A. testified regarding Rache's death. She stated that the family ate sandwiches at Travis Air Force Base. Rachel did not finish her food. Defendant told A. to sit on Rachel. A. sat on Rachel the entire trip from Travis Air Force Base to Porterville. One time Rachel got up to go to the bathroom in the bucket in the van. Rachel cried. A. would try to hold herself up to relieve pressure on Rachel. Defendant had Rachel put a towel over Rache's face so she would not garner sympathy from the other children. Defendant and A. both told Rachel to be quiet. When they arrived in Porterville defendant told A. to stay on Rachel. After defendant went inside the doctor's office, A. got off of Rachel.

After getting off of Rachel, A. moved up towards the front

6

of the van to talk to Joshua and J. She noticed Rachel was not moving and was limp. They moved Rachel to the front of the van. A. tried to give Rachel liquids but was unsuccessful. Joshua went inside to get defendant. Defendant and others came out to try and revive Rachel. Rachel was taken to the hospital.

Defendant told A. and the others to go to the home of the Ruckmans. Defendant called the Ruckmans three times and spoke to the children. She said, "this is big." She told A. a story to tell and to tell the boys to stick to the story. The story was that Rachel got a bag and put it in her mouth while A. and the boys were listening to music. Defendant also instructed A. to call the family attorney.

A. said she and the other children were taken to the police station in the early morning hours of September 8, 2000. The children would not talk to the police. Defendant came in and told the children they could tell the police the truth and everything would be all right. A. understood this message from their mother to mean they should tell the plastic bag story as they had been instructed to do earlier. A. testified she did not believe Rachel would die from getting sat upon.

Ten-year-old E. testified to the abuse in their home and the death of Rachel. E. stated that when the children got in trouble, they oftentimes were spanked with a "rod," which was a plastic or wooden spoon. Defendant hit him with the rod on his feet, knees, tummy, and hands. He would have to lay his hands out flat and she would hit him five or six times. It hurt. If E. cried, defendant would put a plastic bag over his face and it felt like he was going to die. A. would sometimes hit him with a rod after defendant told her to do so.

There were certain eating rules in the house. The smaller children had to finish their food before the big boys finished. If they did not finish their food according to the rules, they either got "poked" or "gurgled." Poking involved having a needle or safety pin poked into their feet. Sometimes A. would hold E. while defendant poked him. It hurt really badly and it would bleed. Sometimes E. was poked in the shoulder. He saw Rachel being poked. "Gurgling" involved getting into the bathtub with your clothes on. Your face would be positioned face up looking towards the faucet. Defendant would then turn the water on. It was very hard to breathe and made E. feel bad. If E. pulled away while he was being gurgled, defendant would call A. to hold E. down. In addition, you could not make noise while you were being gurgled or you would be gurgled longer. If A. would not hold E. down as she was told, she would get gurgled.

E. also testified regarding Rachel's burns and the day of her head injury. He stated that Rachel was burned when defendant told her to get in the hot bathtub. Rachel cried while defendant and A. sat her down in the water. E. stated that one time defendant got angry at Matthew and put his hand on the hot stove. In addition, E. testified that sometimes when he got in trouble he would have to stand in the corner bent over with his hands behind his back. It

hurt.

E. did not see Rachel incur her head injury. According to E., everyone was in the living room except Rachel. Rachel was in her room doing jumping jacks because she had not finished her food. (E. testified that he and other children had to do jumping jacks as a form of punishment. They could not stop if they got tired or else they would get gurgled.) Rachel screamed and everyone ran in to see if she was okay. E. stated that Rachel fell off the bunk bed, even though he did not see the incident.

E. testified regarding the day Rachel died. He said that A. sat on Rachel on the way back from Travis because Rachel did not finish her food and this angered defendant. At the direction of defendant, A. sat on Rachel all the way to Porterville. Rachel was crying; this made E. sad but he did not say anything because he might get sat on. (A. had sat on him before and it hurt.) A. told Rachel to be quiet. Rachel stopped crying. Defendant and some of the other children went inside the doctor's office and A. finally got off of Rachel. Rachel spit up and was not moving. A. tried to give Rachel some water, but she would not drink it. Rachel took some orange juice from J. and then spit up. J. said "not again" and ran inside to get defendant.

Defendant tried to revive Rachel. Rachel was taken to the hospital and E. and the other children went to a friend's house. Defendant told them to be good. Defendant told E. to tell the police that Rachel suffocated on a bag. When the police talked to E., he did not tell them the truth because he was afraid he would be gurgled. E. told the truth later when he knew he would not be sent back to defendant. On a visit with defendant at the jail, defendant whispered in E.'s ear, "Don't tell on me."

E. testified that A. was mean to Rachel; she would call her names and hit her. There was an "[A.] rule" that A. was not to be alone with the younger children.[3] E. showed the jury scars on his body from the various punishments.

Eight-year-old M. testified at trial. She stated that when she got in trouble she got a spanking with a metal rod. The spanking was administered by defendant and involved her feet, hands, back and stomach. If M. cried, defendant would put a plastic bag over her mouth. Sometimes her brothers would have to help with the punishment.

Other punishments were testified to by M., including poking, gurgling, doing jumping jacks, and having time outs in the bent-over position. M. also testified that if they did not finish their food, defendant would put gloves on and shove the food down their throat with two fingers. Additionally M. stated that A., Joshua, J., and Matthew sat on her. She said it hurt a lot and you can't move. Defendant would also pull their fingers back when they did something bad.

---

[3]Defendant was convicted of the misdemeanor child abuse of E. She was acquitted of felony child abuse of E.

M. provided testimony regarding Rachel's head injury. She stated that defendant told A. to check on Rachel. A. checked on Rachel and returned to the living room. Rachel screamed. Rachel was in her room because she had not finished her dinner. She was doing jumping jacks as her punishment. M. testified that Rachel was taken to the hospital and hurt her head because she fell off the bed.

M. testified regarding the burns to Rachel. She said that defendant had water on the stove. A. took it to the bathroom and defendant put Rachel's hands in the pot of water. A. was helping and Rachel was screaming. After this Rachel could not move her hands; they were all "scrunched up."

Concerning the events leading to Rachel's death, M testified that A. sat on Rachel the entire trip from Travis Air Force Base to Porterville. Defendant told A. to sit on Rachel because Rachel did not finish her food fast enough. Rachel cried, and defendant told her she had better shut up or defendant would sit on her. During this trip M. also had to "go down." M. stated that going down involves assuming the same position that Rachel was in when A. was sitting on her; the only difference is that no one sits on you.

After they arrived in Porterville, Matthew, Rebecca, Micah and Paul went inside with defendant. A. got off of Rachel. J. and Joshua found that Rachel was not breathing. They took her to the front seat and tried to give her water. Joshua went inside and got defendant. Defendant tried to get Rachel to breathe. Defendant told the children to say that Rachel had a plastic bag over her face.

Several friends and acquaintances of defendant testified regarding their observations of defendant and the children. Wyonah Rivera testified that the children never went anywhere unescorted. When she asked defendant why her children were so well behaved, defendant responded that she beat them. Kellie Coulter knew defendant and the family and babysat for the children several times. On one occasion she saw A. get a wooden spoon and hand it to defendant. A. then put her palms out. Coulter walked away. She reported that A. did a lot of the chores around the house. Phillip Duncan reported that he never saw A. being mean to the children and that A. did a lot of the childcare, cleaning, etc. At church the children were not allowed to use the toilet but had to go to the van to relieve themselves. Sandra Evans babysat for the children. Defendant would hit the children with a spoon. Defendant would place the older children in charge of the younger children's punishments.

A neighbor of defendant's once heard whipping sounds from defendant's house. She heard a child scream an agonizing scream. Defendant once told Robin Noland that she would not want to be a licensed foster parent because she would not be allowed a free rein in discipline. A friend of defendant's, Carolyn Noland, had dinner at defendant's house. The children ate quickly and stuffed a lot of food in their mouths. Defendant would stuff the mouths of the little children when they ate. One time Rachel did

not want to eat. Defendant directed A. to put food in Rachel's mouth and defendant told Rachel she would plug Rachel's nose until she swallowed if she did not eat. The pastor of the church had been to defendant's house for a barbeque. Defendant forced food into the children's mouths. A. waited on the guests "hand and foot." Defendant would cram food in the children's mouths at church functions. Defendant would hold her hand over the children's mouths until they swallowed. When cramming food in the children's mouths, defendant would tell them they were going to eat the food and eat it on time.

Anne Descoteaux provided child care for defendant. She testified how defendant would have children stand in the corner and put one child in charge of another child to make sure the child being punished did not get out of the corner. Defendant lived with Descoteaux for a period. Defendant's demeanor changed. Defendant "beat the crap out of" the children. Defendant would hit the children with her hands, a belt, and a spoon. She hit them on the legs and hands. Defendant would have an older child sit on a younger child while the younger child was on all fours. Defendant would force feed the children by putting food in their mouths and holding their mouths shut with her hand.

Randy and Lawrence were foster children in defendant's home in 1991. Randy testified that if defendant got mad she would put him in a corner with his hands behind his back; it was very uncomfortable. Defendant had dunked his head in water. He could not breathe and it hurt. He did not tell anyone because he was afraid. Lawrence testified that when he got in trouble he would have to stand in the corner with his hands held high behind his back. Sometimes defendant would sit on his head if he cried. It hurt and he would experience difficulty breathing. Defendant would also pour cold water on him in the bathtub as punishment.

Eric was a foster child in defendant's home in 1991. Matthew, J. and Micah were in the home at the time, as well as two other foster boys. Defendant would make Eric and the others stand in the corner for four or five hours with their hands behind their backs. Defendant would strike them with a wooden spoon. Defendant asked Eric to rough up the other children.

Michael was a foster child in defendant's care. Defendant would hit him with a spoon as punishment. He would be punished if he did not finish his food. He would be hit on the back of his hands. If he cried, he would get hit again. Michael was hit with a metal spoon wrapped in a towel. When defendant was away, she would give the spoon to an older child. Defendant expressed outrage over food not being finished. She would shove food down the children's throats. Michael was required to stand in the corner with his hands clenched behind his back. One time defendant pinned Michael to the floor with her knees to keep him from helping his sister. When the social worker showed up at the house, the atmosphere changed. Michael intentionally misbehaved so he would be removed from defendant's home.

Dr. Donald Hoaglund, a clinical psychologist, evaluated A.

He testified that children who are abused detach from the pain. It is damaging to children to make them punish other individuals. A child might report abuse after been freed from a situation of abuse and given an absolute certainty that they would not be returned to the abusive environment. Abused children often delay reporting abuse. A. appeared to be extremely emotionally constricted. She felt guilty about Rachel's death.

**Defense**

The defense was that A. committed all of the bad acts against Rachel and defendant did not direct A. to do any of the acts nor did she participate in the acts. In addition, the defense presented evidence that the rise in Rachel's temperature at the time of her death and the spots on the sole of Rachel's feet were a result of contracting Rocky Mountain Spotted Fever.

Joshua, A.'s natural brother, testified for the defense. Regarding the burns on Rachel, Joshua reported that he heard a scream and heard a pot fall in the kitchen. Rachel was wet and pointing at A. Defendant came in to see what was going on. Defendant put Rachel in a bathtub of cold water.

Regarding Rachel's head injury, Joshua testified that defendant asked A. to put Rachel to bed. A. did so. A. went back into the room to check on Rachel and within a minute of A.'s leaving the bedroom, Rachel screamed and was found on the floor not breathing. Defendant asked A. what she did.

Joshua testified that A. did not get along with Rachel. A. had been the only girl in the house before Rachel arrived. Joshua stated that the only time they were poked with a needle was to remove a splinter. He testified that when they were in trouble, defendant would punish them by removing privileges. He denied any incidents of poking, plunging, gurgling, etc., occurred in the home. He said there were no special eating rules.

Joshua testified that on the trip from Travis Air Force Base to Porterville, Rachel was sitting in a car seat and A. was sitting next to her. Rachel, J., Joshua and A. were in the van while the rest of the children went inside with defendant for the doctor's appointment in Porterville. Rachel had a plastic bag and was throwing it up in the air. A. said that Rachel did not look right. She was not moving. J. brought Rachel to the front of the van and tried to revive her. Joshua ran in to get help. Defendant tried to revive Rachel. Defendant did not tell A. to sit on Rachel.

Joshua did not speak with law enforcement when he was first questioned because he had been taught by defendant and their lawyer not to talk to others. He testified that the home had the "[A.] Rule," which was that A. was not allowed to be alone with the little children because she was mean.

He testified that when he and A. were foster children and living across the street from one another, A. told him to run across the street. A car hit him.

Matthew, who was adopted by defendant shortly after his

birth, testified on defendant's behalf. He testified that there was no poking or plunging in the household. It was his opinion that A. was mean to Rachel. A. would yell at her, hit her, and yank her around. On the day Rachel was burned, he heard her cry and then saw her wet in the hallway. Defendant came out of the bedroom and took her to the bathroom. A. came down the hall after Rachel. There was a pot and water on the floor in the kitchen.

On the day of Rachel's head injury, A. was coming out of the bedroom after checking on Rachel. They heard Rachel scream. They went in the room and she was on the floor.

Matthew testified that on the trip from Travis Air Force Base to Porterville he heard Rachel say to A., "stop messing with me." When they arrived at the doctor's office in Porterville, everyone went inside except Joshua, J., A., Rachel, and Matthew. Neither E. nor M. remained in the van. Joshua ran inside when they realized Rachel was having difficulties. Defendant came out and attempted to revive Rachel. It was Matthew's testimony that no one sat on anyone in the van.

On cross-examination, Matthew stated that he initially told the detective that the burns to Rachel happened while he was away at camp with some of his brothers. At trial, he testified this was not accurate and he does not remember telling the detective he was away. He lied to officers previously when he told them he had been spanked; he lied because he was tired.

Friends and acquaintances testified that they never saw defendant doing anything inappropriate with the children. Janet Cameron testified that defendant and the children visited her in Oklahoma in late August of 2000. Rachel seemed normal. She reported that A. had been very controlling from age 10. Once Cameron saw A. masturbating. An eye doctor saw the entire family on May 26, 2000. The children were very polite and he did not notice any injuries on the children. The children were in local theater productions. They acted fine and Rachel did not have any noticeable injuries.

Gail Hendershot, a psychotherapist, interviewed defendant many times. She concluded that A. has a conduct disorder that results in A.'s violating the rights of others without caring about the other person. A. has serious problems with attachment and there is evidence of sexual abuse in A's previous home. Hendershot testified that a child that has been sexually abused will sometimes resexualize by abusing others at the same age they were abused.

A nurse conducted a sexual assault exam on Rachel's body after her death. She concluded that Rachel had been molested prior to her death.

Dr. Timothy McCalmont, an expert in pathology of the skin, looked at samples taken from the sole of Rachel's feet. It was his opinion that the marks on the bottom of Rachel's feet were not humanly inflicted. It was his opinion that Rachel had an infection at the time she died. A fever and a petechial skin rash are "very characteristic of Rocky Mountain Spotted fever." He did not think

it was possible to cause a substantial elevation in temperature by having someone sit upon another individual.

Lodged Doc. No. 1.

The jury convicted petitioner of second degree murder, assault, and felony child abuse. Additionally, Petitioner was convicted of two misdemeanor counts of child abuse.    Petitioner appealed her conviction to the California Court of Appeal.  On November 21, 2003, the Court of Appeal affirmed the judgment.   On or about December 8, 2003, petitioner filed a petition for rehearing with the Court of Appeal.  On December 16, 2003, the Court of Appeal denied the petition for rehearing.

On or about December 30, 2003, petitioner filed a petition for review with the California Supreme Court.  On February 18, 2004, the California Supreme Court denied the petition for review.

On February 9, 2005, Petitioner filed her timely application for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254(a), challenging her conviction. Petitioner raises five federal constitutional claims: (1) that the prosecutor unethically led her sons to believe they would be prosecuted if they testified in her defense, in violation of her Sixth and Fourteenth Amendment rights; (2) that Petitioner's Sixth and Fourteenth Amendment rights were violated when the judge encouraged her son J. to invoke his Fifth Amendment rights and then struck all of his testimony; (3) that the judge violated Petitioner's Sixth and Fourteenth Amendment rights when he appointed a guardian ad litem for five of her minor sons and gave the guardian the power to invoke the sons's Fifth Amendment rights and attorney client privileges despite their desire to waive those rights; (4) that Petitioner's Fourteenth Amendment rights were violated when the court erroneously admitted other bad acts evidence and invited the jury to draw a prohibited propensity inference due to a deficient jury instruction; (5) that Petitioner's Sixth and Fourteenth Amendment rights were violated when a juror in voir dire intentionally concealed material information tending to show that he was not impartial, and had he been honest, there would have

been grounds for a valid challenge for cause.  All five claims have been exhausted.

**II**

An application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(a)  "shall not be granted with respect to any claim that was adjudicated on the merits" in state court unless the adjudication of the claim:

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of  the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

**III**

**A**

Petitioner asserts in her application for writ of habeas corpus that at trial, the prosecutor unethically led her sons to believe they would be prosecuted if they testified in her defense, in violation of her Sixth and Fourteenth Amendment rights.  Petitioner contends that as a result, two of her sons did not testify, and the other son refused on Fifth Amendment grounds to testify that her daughter was solely responsible for Rachel's death.

The standard of review for prosecutorial misconduct in federal habeas cases is "the narrow one of due process, and not the broad exercise of supervisory power." *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974).  A defendant's due process rights are violated if prosecutorial misconduct renders a trial "fundamentally unfair." *Darden v. Wainwright*, 477 U.S. 168 (1986).  Courts in federal habeas cases review claims of prosecutorial misconduct "to determine whether the prosecutor's remarks 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Hall v. Whitley*, 935 F.2d 164, 165 (9th Cir. 1991) (quoting *Donnelly*, 416 U.S. at 643).  "That standard allows a federal court to grant relief when the state-court trial was fundamentally unfair but avoids interfering in state-court proceedings when errors fall short of constitutional magnitude." *Drayden v. White*, 232 F.3d

704, 713 (9th Cir. 2000).

The first instance of alleged misconduct occurred outside the presence of the witnesses and jury, when the district attorney advised the court of the possibility that Petitioner's sons would be committing perjury in their testimony. Repr. Tr. 1313-1322 (Vol. 6). The prosecutor explained the problem to the Court as follows:

> There are a number of older children, the older boys that will be testifying for the defense. Some – I believe all of 'em testified at the dependency proceeding under oath, and they also – a few of them testified at the preliminary hearing that there was no abuse going on in the home, no one was ever mean to anyone, nobody ever sat on anyone; basically, there was nothing wrong in this household.
>
> My concern, and as an officer of the court I wanted to bring it to the court's attention, that in those previous hearings, both of those, they were sworn under oath to tell the truth. Now if they come in here today or in the coming weeks – I reviewed a number of statements that were provided by Denver Dunn, who is the defense investigator, in which he plays a tape for the boys, and she tells – the defendant tells the boys on the tape you can now come forward with the truth, with that information people told us to keep quiet on, refers to Mr. Bourdette, and then they provide a statement saying that yes, we all protected Angel. She was mean to Rachel. We all tried to protect her, and she could have very well sat on her in the van.
>
> Now, I'm not reading from a transcript right now, but I'm just giving you a short summary here.
>
> My concern is that now if they're going to get up under oath and testify to something different than what they've previously testified to, there may be some issues about perjuring themselves, and they may need an attorney to be present to advise them of the potentials of testifying under oath, considering they already have previous testimony under oath.
>
> . . .
>
> I'm in no way trying to keep these boys off the stand, but the court needs to be aware there is a potential for them perjuring themselves. I think just as a prosecutor, as an officer of the court, that I need to let you know that, you know.
>
> I don't intend to talk to Bob Bartlett about what his client may have testified to at the CPS proceeding. I'm concerned that if they take the stand in this jury trial and they say something very

different than what they previously testified to, they are looking at exposure to perjury, and that's something I can't, you know, do anything about.

Repr. Tr. 1314-1316 (Vol. 6).  The Court did not to act on the prosecutor's statements at that time.

The next time the prosecutor mentioned that the boys might need an attorney, was before J. took the stand.  The following conversation took place in chambers, outside the presence of the jury and the boys:

[Prosecutor]: Initially, we had talked about – in the motion in limines, the fact that he is being accused of child molest, the victim being Moriah Thompson, and that there is a witness, Rebecca Thompson.  That case was investigated by the sheriff's office, and it was submitted to the District Attorney's Office, the juvenile unit.

Now, when we had talked initially in motions in limine, the argument was that if counsel was going to bring in that Rachel was sexually abused by Angel, that I would have the opportunity to bring out the fact that accusations have been made against Jonathan so as to show that there may be other potential perpetrators involved.

My concern is that as an officer of the court, I need to let the court know that because there's a possibility that charges may be filed against, him, he may need an attorney with respect to that.

The Court: That seems appropriate.  Did he have an attorney during the CPS proceedings?

[Prosecutor]: Yes, he did, and that's Bob Bartlett.

[Defense Counsel]: Bob Bartlett.  I didn't intend on asking him any questions about that on my direct, and I think it's pretty much irrelevant to the case, but – and he has denied this to the police. . . .

The Court: Well, if he had an attorney in the CPS proceedings, it seems to me that out of an abundance of caution, I think Mr. Bartlett should be contacted so that if something does arise that is within the purview of protected right of Jonathan, that can be addressed.

Repr. Tr. 3112-3113 (Vol. 16).

Just before J. took the stand, defense counsel made an accusation of prosecutorial

16

misconduct.  The following proceeding took place in open court, outside the presence of the jury:

> [Defense Counsel]: I've been told apparently they're reviewing to file charges today and – against this young man who's supposed to be my best witness, and I – I find it very coincidental on the day this young man is supposed to testify they're talking about filing charges against him, and, you know, I think that's an abuse of the process, and it's prosecutorial misconduct to be – to be doing that.
>
> They've had this case since May or April.  April was when the complaints were first made by Moriah and Rebecca, and why the juvenile division has waited till now to review it and file charges, you know – as I said, I find that very coincidental.
>
> . . .
>
> [Prosecutor]: I brought up the issue when we were doing motion in limines about whether I could bring that out if he started accusing Angel of potential sexual molestation.  It was brought out at that time.  Whether he's been charged or not charged, he still has a right to have an attorney present.
>
> The Court: Absolutely.
>
> [Prosecutor]: So whether we make the decision to file this case today or a week ago or whenever we decided it, the point is, is that the allegation was made.
>
> That was brought to counsel's attention over a month ago in the motion in limines, and it occurred to me this weekend when I got ready to review all the information pertaining to Jonathan Thompson that if we were going to go into that area, that Mr. Bartlett needed to be contacted, and that was the only reason I did it.
>
> As far as having any role in the filing over there, I've specifically tried to stay away from that.  I did obtain a copy of the police report from them, so I can provide that in discovery, but, quite frankly, it doesn't matter if we filed charges against him or not.  The point is, is that he needs to have an attorney talk to him.

Repr. Tr. 3181-3183 (Vol. 16).

Petitioner alleges that the prosecutor "used as tools the judge and Bob Bartlett, the attorney who the judge appointed to render advice at the prosecutor's request."  Petr.'s Traverse 6.  Petitioner relies on *In re Martin*, 44 Cal.3d 1 (1987) for the proposition that the threats do not

need to be directly to the witnesses if the prosecutor "expected and . . . hoped the witness's attorney would communicate the statement to the witness." *Id.* at 41.  Petitioner's cites to the reporter's transcript pages 1315 and 3201 alleging that she intended for Mr. Bartlett to communicate the threat of perjury charges to the boys.

This Court agrees with the California Court of Appeal's determination that these allegations are without merit.  The Court's decision reads as follows:

> To the contrary, at page 1315 the prosecutory told the court that the boys testified previously under oath and had now given statements that appear contrary.  She was concerned that there may be issues about perjuring themselves and they may need an attorney to advise them of the "potentials of testifying under oath, considering they already have previous testimony under oath."  The next citation to the record occurred after J. began his testimony and Bartlett stated, outside the presence of the jury, that J. might be facing perjury charges if he testified inconsistently with his prior testimony. To this the prosecutor state, "I raised this issue last week or the week before . . . ."  The prosecutor did not state that she wanted the attorney for the boys to tell the boys she was contemplating perjury prosecutions; her comments indicated she wanted the court to be aware of the problem so the court could assure that it was handled properly.  This did not amount to prosecutorial misconduct.

Lodged Doc. 1 at 41-42.

The prosecutor's remarks did not render the trial fundamentally unfair to deprive Petitioner of her due process rights.  *See Hall v. Whitley*, 935 F.2d at 165 ("We must review that claim on the merits, examining the entire proceeding[s] to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process.") (quotations omitted).  "'[M]erely warning a witness of the consequences of perjury' does not unduly pressure the witness's choice to testify or violate the defendant's right to due process." *Williams v. Woodford,* 384 F.3d 567, 603 (9th Cir. 2004) (quoting *United States v. Emuegbanum*, 268 F.3d 377, 300 (6th Cir. 2001).

Despite the prosecutor's suggestion, and the advise of counsel, some of Petitioner's sons testified for the defense.  The prosecutor's comments did not prevent J. from taking the stand, although the court ultimately struck his testimony.  Significantly, two of the sons, Joshua and

1  Matthew, testified that Angel, not Petitioner, abused Rachel.  Therefore, the prosecutor's conduct
2  did not violate Petitioner's due process rights.

3      Petitioner also relies on *United States v. Westerdahl*, 945 F.2d 1083 (9th Cir. 1991) for the
4  proposition that the prosecutor denied her due process by granting immunity only to witnesses for
5  the prosecution.  In *Westerdahl*, Petitioner was granted an evidentiary hearing to determine
6  whether there was prosecutorial misconduct when there were two conflicting stories and the
7  defense only had one witness who could testify to the events.  *Id.* at 1087.  The Petitioner's
8  reliance is misplaced.  In this instance, Petitioner was not denied due process, because the failure
9  to grant immunity did not prevent her from presenting her case.  Two of her sons testified and
10 presented her defense.  "[A]n accused is not entitled to compel a prosecutor to grant immunity to
11 a potential witness."  *United States v. Shirley*, 884 F.2d 1130, 1133 (9th Cir. 1989).

12     The California Court of Appeal concluded that the prosecutor's conduct did not amount to
13 prosecutorial misconduct.  It held that "[t]he prosecutor should not be faulted for apprising the
14 court of problems that may arise in the proceeding so that the court could act to protect the rights
15 of the boys and the defendant, if necessary."  (Lodged Doc. No. 1 at 39).   The prosecutor's
16 actions did not deprive the defendant of an opportunity to present her case to the jury and did not
17 render the trial "fundamentally unfair."

**B**

19     Petitioner also contends that her Sixth and Fourteenth Amendment rights were violated
20 when the judge encouraged her son J. to invoke his Fifth Amendment rights and then struck all of
21 his testimony.

22     Petitioner cites *Webb v. Texas,* 409 U.S. 95 (1972), in support of his claim of judicial
23 misconduct.  In *Webb*, the trial judge "gratuitously singled out . . . one witness for a lengthy
24 admonition on the dangers of perjury," thereby implying "that he expected [the witness] to lie."
25 *Id.* at 97. The judge then proceeded to assure the witness "that if he lied, he would be prosecuted
26 and probably convicted for perjury, that the sentence for that conviction would be added on to his

present sentence, and that the result would be to impair his chances for parole." *Id.* The witness subsequently refused to testify. This was the only witness petitioner called for his defense. The United States Supreme Court concluded that the trial judge's remarks "effectively drove that witness off the stand." *Id.* at 98. The Court held that the trial judge had, in effect, denied the defendant the right to present his own witnesses, thus violating his due process rights under the Fourteenth Amendment. *Id.*

Here, the trial judge was informed by the prosecutor that there was the possibility J., a 16 year-old boy, would perjure himself and could be facing molestation charges. Given the serious consequences that could result from J.'s testimony, the judge used his discretion to warn J. about his right not to testify. J. was also indecisive about testifying, appearing confused about what questions he should answer and when he should invoke his Fifth Amendment rights. After a review of the trial record, it appears to this Court that the judge's questions and warnings were designed to clear up uncertainties and ambiguities in both the testimony and the questioning. Under *Webb* and its progeny, "[a] defendant's constitutional rights are implicated only where the prosecutor or trial judge employs coercive or intimidating language or tactics that substantially interfere with a defense witness' decision whether to testify." *United States v. Vavages*, 151 F.3d 1185, 1189-90 (9th Cir.1998). There is no evidence in the record that the trial judge's actions had any impact on the substance of the testimony of any defense witness. *Webb* is thus clearly distinguishable. Further, despite his attorney's advice and the judge's comments, J. ultimately decided to testify. In *United States v. Jaeger,* Nos. 06-30621, 06-30622, 2008 WL 3861685 (9th Cir. Aug. 18, 2008), the Ninth Circuit held that a trial court does not commit misconduct when it provides a brief, factual, and explanatory warning to a witness regarding the possibility that he or she may be incriminated by testifying. After the trial judge's warning, the witness in *Jaeger* decided not to testify. *Id.* at *3. The Ninth Circuit concluded in *Jaeger* that even though the witness did not testify, the judge's actions did not violate the Defendant's Sixth Amendment rights. *Id.* at *5. Here, J. testified, despite the numerous warnings from the judge regarding the

1  possibility of self-incrimination.  Thus, this court's warning did not prevent or coerce J. from

2  testifying.  *See id.* at *5 ("The court did not prevent [the witness] from testifying, did not threaten

3  her, did not coerce her, did not substantially interfere with her decision to testify, and did not

4  drive her off the stand.").

5       Petitioner also claims that the trial judge improperly struck J.'s testimony after J. refused

6  to answer questions on cross-examination about Rachel's death.  Federal courts do not review

7  questions of state evidence law.  *Jammal v. Van De Kamp,* 926 F.2d 918, 919 (9th Cir. 1991).

8  "Incorrect state court evidentiary rulings cannot serve as a basis for habeas relief unless federal

9  constitutional rights are affected."  *Lincoln v. Sunn*, 807 F.2d 805, 816 (9th Cir. 1987).  A state

10 court's decision to exclude certain evidence must be so prejudicial as to jeopardize the

11 defendant's due process rights.  *Miller v. Stagner*, 757 F.2d 988, 994 (9th Cir.), *amended on other*

12 *grounds*, 768 F.2d 1090 (9th Cir.1985), *cert. denied*, 475 U.S. 1048, 1049, 89 L.Ed.2d 577, 579

13 (1986).  To evaluate whether exclusion of evidence reaches constitutional proportions, a federal

14 court must consider five factors: (1) the probative value of the excluded evidence on the central

15 issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is

16 the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of

17 the attempted defense.  *Tinsley v. Borg*, 895 F.2d 520, 530 (9th Cir. 1990).  Accordingly, the

18 reviewing court must balance the importance of the evidence against the state interest in

19 exclusion.  *Id.*

20      The defense that Petitioner advanced at trial, with J.'s testimony, was that Angel abused

21 and killed Rachel, and that Petitioner did not participate in or direct any of the acts.  J. testified

22 regarding Rachel's burn, Rachel's head injury, and Angel's behavior towards Rachel.  However,

23 when the prosecutor tried to cross-examine him, he invoked his Fifth Amendment rights.  The

24 court struck J.'s testimony.

25      The exclusion of J.'s testimony did not render Petitioner's trial fundamentally unfair.

26 Though J.'s testimony that Angel abused Rachel had probative value as to Petitioner's defense, it

1   was not the sole evidence supporting the defense.  Instead, J.'s testimony on direct examination

2   was cumulative to the evidence presented by Matthew and Joshua.  Thus, in light of the *Tinsley*

3   factors, the exclusion of J.'s testimony did not jeopardize Petitioner's due process rights.

4   **C**

5     Petitioner further contends that the judge violated her Sixth and Fourteenth Amendment

6   rights when he appointed a guardian ad litem for five of her minor sons and gave the guardian the

7   power to invoke the sons's Fifth Amendment rights and attorney client privileges despite their

8   desire to waive those rights.

9     The Sixth Amendment right to compulsory process guarantees a defendant the right to

10  present her defense.  *Washington v. Texas,* 388 U.S. 14, 19 (1967).  This right is fundamental to

11  due process.  *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973).  However, this right is not

12  absolute and is not violated by reasonable testimonial exclusions.   *See Taylor v. Illinois*, 484 U.S.

13  400, 410 (1988) (the Sixth Amendment is not "an unfettered right to offer testimony that is

14  incompetent, privileged, or otherwise inadmissible under standard rules of evidence");

15  *Washington v. Texas,* 388 U.S. at 23 n.21 (enumerating examples of state law testimonial

16  exclusions that would not violate the Sixth Amendment).

17    Petitioner must establish that the guardian ad litem created a "substantial burden" on the

18  creation of her defense.  *Clark v. Arizona*, 548 U.S. 735, 792 (citing *U. S. v. Scheffer,* 523 U.S.

19  303, 316-17 (1998)).  A substantial burden must unreasonably deprive Petitioner of testimony that

20  is both "material and favorable" to her defense.  *See U.S. v. Valenzuela-Bernal*, 458 U.S. 858, 859

21  (1982).

22    Here, the appointment of a guardian ad litem was reasonable.  "[T]he mere invocation of

23  [the Sixth Amendment right to compulsory process] cannot automatically and invariably

24  outweigh countervailing public interest."  *Taylor*, 484 U.S. at 414.  The appointment of the

25  guardian was in the public's interest, as it was necessary to protect Petitioner's five minor

26

1  children from making inculpatory remarks.

2      Further, there is no indication that the appointment of the guardian ad litem diminished

3  Petitioner's ability to build her defense by stripping her of material testimony.  First, prior to the

4  appointment of the guardian ad litem, three of Petitioner's sons had already testified on

5  Petitioner's behalf.  (Lodged Doc. No. 1 at 16-17).  Second, also prior to the appointment of the

6  guardian, the remaining two sons expressed their desire to invoke their Fifth Amendment

7  privileges.  Id.  Third, testimony of Petitioner's friends, *Id.* at 18, and several expert witnesses, *Id.*

8  at 18-19, all corroborated Petitioner's defense.  Therefore, even with the appointment of the

9  guardian ad litem, Petitioner's defense was more than adequate for purposes of the Sixth

10  Amendment.  *See Taylor*, 484 U.S. at 402-03, 416 (upholding the constitutionality of excluding

11  "surprise witnesses" testimony in defense of an accused, who only had two other witnesses).

**D**

13      Petitioner further asserts that her Fourteenth Amendment rights were violated when the

14  court erroneously admitted other bad acts evidence and allegedly invited the jury to draw a

15  prohibited propensity inference due to a deficient jury instruction.

17      Petitioner's entitlement to habeas relief on this ground does not turn on whether a state

18  evidentiary law has been violated "but whether the trial court committed an error which rendered

19  the trial so arbitrary and fundamentally unfair that it violate[s] federal due process."  *Jammal*, 926

20  F.2d at 920 (internal quotation omitted).   For an admission of evidence to violate due process

21  there must be "*no* permissible inferences the jury may draw from [it]."  *Jammal*, 926 F.2d at 920.

22      The prior bad acts at issue included instances involving "hitting, food, sitting on the back,

23  using older children to compel compliance and so forth."  Repr. Tr. 1249 (Vol. 6).  This evidence

24  was presented by the prosecutor to demonstrate that Petitioner's oldest daughter acted at

25  Petitioner's behest in order to punish Rachel.  *Id.* at 1250.  Based on this evidence, the jury could

26  have inferred motive, intent, plan, state of mind, and/or absence of mistake or accident, all

permissible inferences from the evidence of prior bad acts.  (Lodged Doc. No. 1 at 59).  However, the jury's actual use of this evidence is of no importance to the constitutionality of this issue, provided the jury instruction was proper.  *Jammal,* 926 F.2d at 920 ("[e]vidence . . . will often raise more than one inference, some permissible, some not; [and this Court] must rely on the jury to sort them out in light of the court's instructions.  Only if there are *no* permissible inferences . . . can its admission violate due process.").

Petitioner further challenges the prior bad acts jury instruction.  In regards to the prior bad acts evidence, the jury was instructed as follows:

> Except as you may otherwise be instructed, such evidence, if believed, may not be considered by you to prove that defendant is a person of bad character or that she has a disposition to commit crimes.  It may be considered by you only for the limited purpose of determining if it tends to show a characteristic *method, plan or scheme* in the commission of criminal acts similar to the *method, plan or scheme* used in the commission of the offenses in this case which would further tend to show the existence of the intent, which is a necessary element of some of the crimes charged or the identity of the person who committed the crime, if any, of which the defendant is accused *or a clear connection* between the other offense and the one of which the defendant is accused so that it may be inferred that if the defendant committed the other offense or offenses, defendant also committed the crimes charged in this case.

Repr. Tr. 2012-13 (Vol. 10) (emphasis added).  Petitioner claims that this instruction created a reasonable likelihood that the jury used the evidence to infer propensity, which Petitioner claims is unconstitutional.  Petitioner credits the disconnect between the "clear connection" language and the "method, plan or scheme" language of the instruction for this deficiency.

Although this instruction may have been deficient, its deficiency will only lead to habeas relief if the "instruction by itself so infected the entire trial that the resulting conviction violates due process."  *McGuire*, 502 U.S. at 72 (internal quotations omitted).  Further, this instruction may not be considered in isolation of the instructions as a whole.  *Id.*

When read in the context of the instructions as a whole, there is no reasonable likelihood

that the instruction permitted an inference of propensity.  *See McGuire*, 502 U.S. at 74.  First, the "clear connection" language is redundant in light of the "method, plan or scheme" language that precedes it.  Repr. Tr. 2013 (Vol. 10).  Thus, the instruction is correct when separated by the disjunctive "or," and neither clause permits misuse.  The trial court's instructions expressly prohibited the jury from using the evidence to infer propensity.  The trial court admonished the jury as follows:  "For the limited purpose for which you may consider such evidence, you must weigh it in the same maner as you do all other evidence in this case, and you're not permitted to consider such evidence for any other purpose."  *Id*. at 2013-14.  Expressly prohibiting a jury from using prior crimes evidence to infer propensity is a recognized safeguard against possible misuse.  *McGuire*, 502 U.S. at 74.  When taken as a whole, the jury instructions do not amount to a constitutional violation and do not warrant habeas relief.

E

Petitioner also contends that her Sixth and Fourteenth Amendment rights were violated when a juror intentionally concealed material information during the voir dire examination tending to show that he was not impartial, and had he been honest, there would have been grounds for a valid challenge for cause.

The standard for evaluating juror misconduct is whether the misconduct had a substantial and injurious effect or influence on the verdict.  *Jeffries v. Wood,* 114 F.3d 1484, 1489 (9th Cir. 1997) (en banc).  In order to establish juror misconduct based on voir dire questions, a party must demonstrate the following: (1) a juror failed to answer honestly a material question in voir dire; and (2) a correct response would have provided a basis for challenge for cause.  *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984).

On November 16, 2001, Petitioner filed a motion for a new trial, based on alleged jury misconduct.  In her motion, Petitioner claimed that Juror No. 6, the foreperson, concealed relevant facts.  The basis of the claim was a declaration from Juror No. 11 that during

25

deliberations, Juror No. 6 "talked about himself being abused as a child and that he knew about child abuse.  He indicated that his father was in the service and would swing his belt buckle, hitting him in the head and knocking him out."  Prior to the trial, each prospective juror was given a written questionnaire to answer.  Question 19 posed the following question: "How were you disciplined as a child?  Do you feel it was appropriate?"  Juror No. 6 responded: "Normal type; grounded, no TV, no phone no toys.  Must stay at home and yard only.  Discipline was appropriate."  Petitioner argued in her motion for a new trial that the above facts demonstrated that juror No. 6 lied under oath during his voir dire examination about serious prior abuse he had suffered as a child.    During the proceedings for the motion for a new trail, Juror No. 1 alleged: "Juror No. 6, the foreperson, did talk about an incident of being hit with a belt buckle by his father.  He spoke of this near the middle or end of deliberations.  I recall him also talking about becoming unconscious as part of this incident.  I do not recall, however, exactly how he explained this unconsciousness came about during the incident with his father."  Doc. No. 1 at 67.

The prosecutor countered this evidence with several affidavits from other jurors.  Juror No. 6 stated in his or her affidavit: "During the deliberations. we dealt with the issue of child abuse . . . the degree and level of child abuse discussed . . .  and I myself brought up an instance with my father where he spanked me one time with a belt on the buttocks.  I did not say the brass buckle on his belt hit me in the head and knocked me out."  *Id.*  Jurors Nos. 2, 8, and 5 also testified that Juror No. 6 did not make the alleged statement about being hit in the head by a brass belt buckle.

The trial court denied the motion for a new trial, concluding that the overwhelming weight of the evidence was that Juror No. 6 did not make the statement that he was hit on the head with a brass belt buckle.

The California Court of Appeal held that Juror No. 6 did not answer a material question dishonestly or conceal information during voir dire.  It reasoned as follows:

The question asked of juror No. 6 on the questionnaire was how he was disciplined as a child.  The question asked for a general response.  It did not ask for specific instances of discipline but asked for a general overview of discipline as a child.  Juror No. 6 was hit by a belt one time.  From the answer it is clear that this was not a usual method of discipline in the household, but a one-time instance.

The Court of Appeal's conclusion that Juror No. 6 was not dishonest in his answer to a material question in voir dire is neither contrary to clearly established Federal law nor involved an unreasonable application of clearly established Federal law.  Question 19 asked the potential juror about how he or she was disciplined generally, not about specific instances.   Accordingly, Petitioner is not entitled to relief on this claim.

### Conclusion

Therefore, the state court's rejection of Petitioner's federal constitutional claims was not "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d).

It is therefore hereby ORDERED that Petitioner's application for habeas corpus relief is DENIED.  The clerk is directed to enter judgment and close the case.

/////

DATED: August 28, 2008

/s/ Arthur L. Alarcón
UNITED STATES CIRCUIT JUDGE
Sitting by Designation